**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| HEIDI CARTAGENA NIEVES,<br><br>Plaintiff,<br><br>v.<br><br>MENNONITE GENERAL HOSPITAL INC. DBA HOSPITAL MENONITA CAYEY; DR. JORGE L. CALDERON JIMENEZ; JORGE CALDERON, INC., C.P.; SINDICATO DE ASEGURADORES PARA LA SUSCRIPCION CONJUNTA DE SEGURO DE RESPONSABILIDAD PROFESIONAL MEDICO-HOSPITALARIA ("SIMED"); PUERTO RICO MEDICAL DEFENSE INSURANCE COMPANY ("PRMD"); ABC INSURANCE COMPANY, JOHN DOE, JAMES ROE,<br><br>Defendants. | Civil No.: 23-cv-1126<br><br><br>RE: TORT ACTION FOR MEDICAL MALPRACTICE PURSUANT TO ARTS. 1536,1540 and 1541, 31 P. R. Laws Ann. § 1080, 10805 AND 10806<br><br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

TO THE HONORABLE COURT:

APPEARS NOW the Plaintiff, HEIDI CARTAGENA NIEVES, through the undersigned counsel, and hereby states, alleges, and requests as follows:

**JURISDICTIONAL BASIS**

1. This case is based upon diversity jurisdiction under 28 U.S.C. §1332.

2. Plaintiff is domiciled in and is resident of the state of Florida.

1

3.  All Defendants are either individuals who reside in Puerto Rico or corporations organized under the laws of the Commonwealth of Puerto Rico with their principal place of business in P.R. or of states other than Florida.

4.  The matter in controversy exceeds the sum of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00), exclusive of interest and costs, thus vesting jurisdiction on this Honorable Court pursuant to 28 U.S.C. § 1332.

5.  Venue is proper in the District of Puerto Rico pursuant to 28 U.S.C. §1391, since the events and acts or omissions giving rise to this claim occurred in this district.

## **THE PARTIES**

6.  Plaintiff, HEIDI CARTAGENA NIEVES ("Plaintiff" or "Mrs. Cartagena") is of age, single and a resident of the state of Florida.

7.  Codefendant MENNONITE GENERAL HOSPITAL, INC. d/b/a HOSPITAL MEMONITA CAYEY  ("MGH" or "hospital"), is a corporation organized, existing, and with its principal place of business in Puerto Rico or a state other than Florida.

8.  Codefendant MGH owns and/or operates a hospital located in Cayey, Puerto Rico, wherein it provides its patients with a gamut of hospital services and/or hospital care, including emergency, surgery, internal medicine, PACU, ICU, laboratory, nursing, OB-GYN and other hospital care and services.

9.  Codefendant, DR. JORGE L. CALDERON JIMENEZ ("Dr. Calderon"), of age, licensed to practice by the state board in Puerto Rico, practices general medicine, affiliated with Hospital Menonita de Cayey, and other health care providers.

10. Codefendant, JORGE CALDERON, INC., C.P. ("JORGE CALDERON, INC."), is a professional corporation organized, existing, and with its principal place of business in Puerto Rico or a state other than Florida, presided and own by Codefendant Dr. Calderon.

11. Codefendant SINDICATO DE ASEGURADORES PARA LA SUSCRIPCIÓN CONJUNTA DE SEGURO DE RESPONSABILIDAD PROFESIONAL MÉDICO-HOSPITALARIA ("SIMED") is an insurance company organized, existing, and with its principal place of business in Puerto Rico or a state other than Florida which issued insurance policies for medical malpractice on behalf of one or more of the physician codefendants joint tortfeasors in this case, for the acts and/or omissions described herein, encompassing the relevant period of time.

12. Codefendant PUERTO RICO MEDICAL DEFENSE INSURANCE COMPANY ("PRMD") is an insurance company organized, existing, and with its principal place of business in Puerto Rico or a state other than Florida which issued insurance policies for medical malpractice on behalf of one or more of the physician's Codefendants joint tortfeasors in this case, for the acts and/or omissions described herein, encompassing the relevant period of time.

13. Codefendant A, B, C INSURANCE COMPANIES, are unknown insurance providers authorized to make business under the laws of the Commonwealth of Puerto Rico, named herein, to be later replaced by their actual names which may become known through further discovery in this litigation, and who may be liable to the plaintiffs, in whole or in part, for the actions and/or omissions herein

3

described, encompassing the relevant period of time, and the damages suffered by the plaintiffs.

14. Codefendants unknown joint tortfeasors JOHN DOE and JAMES ROE are physicians or other health care providers fictitiously named herein, to be later replaced by their actual names which may become known through further discovery in this litigation, and who may be liable to the plaintiffs, in whole or in part, for the actions and/or omissions herein described, encompassing the relevant period of time, and the damages suffered by the plaintiffs.

15. Pursuant to 31 P.R. Laws Ann. § 2001, a direct action may be brought in the Commonwealth of Puerto Rico against a casualty or liability insurance carrier for the negligence or fault of its insured.

16. Pursuant to 31 P.R. Laws Ann. § 2003, an action against an insurer may be brought separately or may be joined with an action against its insured.

## GENERAL ALLEGATIONS

17. At the time of the events that give basis to this complaint Plaintiff was a pregnant woman of 35 years of age with no previous medical conditions.

18. Early in the morning of April 10th, 2022, Mrs. Cartagena started to suffer from vaginal bleeding and pelvic pain.

19. As the morning progressed, Mrs. Cartagena could barely walk and her pain and bleeding aggravated, and she was taken to the hospital by her mother Carmen Nieves.

4

20. Mrs. Cartagena arrived at the emergency room ("ER") of MGH at approximately 8:30 am.

21. Mrs. Cartagena went to MGH because her gynecologist, Dr. James Wagner, had privileges there.

22. As soon as she arrived at the hospital, Plaintiff provided MGH´s personnel with Dr. James Wagner´s contact information but they did not call her doctor in time for him to arrive and evaluate Mrs. Cartagena while she was in the ER.

23. Dr. Calderon was the ER doctor that provided medical care to Mrs. Cartagena while at the ER.

24. MGH's record shows that Dr. Calderon allegedly evaluated and performed a physical exam on Mrs. Cartagena at about 9:00 am.

25. Dr. Calderon´s evaluation incorrectly documented that Mrs. Cartagena had no surgical history when she had a previous cesarean section.

26. Dr. Calderon´s initial physical evaluation, per MGH's records, inaccurately describes that Mrs. Cartagena had no pain when in fact, her main complaint for going to the hospital was vaginal bleeding and pelvic pain.

27. Dr. Calderon´s initial physical evaluation of Mrs. Cartagena, per MGH's records, describes her eyes, ears, nose, throat, neck, cardiovascular system, extremities, and cranial nerves as normal when in fact, he failed to actually check and evaluate any of these in the initial physical evaluation.

28. During the initial physical evaluation, there was no actual physical interaction between Dr. Calderon and Mrs. Cartagena, which would be necessary for the doctor to perform an adequate physical examination of the patient.

29. The only interaction between Dr. Calderon and Mrs. Cartagena was through verbal communication while the doctor was continuously looking at his computer screen.

30. Dr. Calderon documented Plaintiff's condition in MGH's records as an intrauterine pregnancy of 23 weeks with an acute status and vaginal bleeding.

31. After the initial evaluation of Plaintiff, Dr. Calderon failed to order that Mrs. Cartagena be connected to a fetal monitor at any time. He also failed to order that Mrs. Cartagena be transferred to an adequate birthing room at MGH, suitable to monitor and treat both mother and baby.

32. After the initial evaluation of Plaintiff, MGH's nurses failed to monitor Mrs. Cartagena's baby prior to his birth.

33. After the initial evaluation Mrs. Cartagena was taken on a stretcher to an ER corridor with other sick patients while she was in pain, bleeding, and scared, with no knowledge of what would happen next.

34. At around 10:30 am, MGH's record describes Mrs. Cartagena in severe pain, crying and moaning.

35. At approximately 11:00 am, Mrs. Cartagena was consulted by a nurse about a pelvic exam, and Plaintiff requested that an obstetrician examine her. The nurse then offered Plaintiff the option to be evaluated by a female obstetrician, to which she agreed. However, the nurse came back and told Mrs. Cartagena that the female doctor had refused to do it and that it was Dr. Calderon who was supposed to perform the pelvic examination. Mrs. Cartagena manifested understanding and then waited for Dr. Calderon to come and examine her.

36. At approximately 11:40 am, Mrs. Cartagena was taken by a nurse to another room for an ultrasound to be performed. The ultrasound revealed a fetus in breech presentation with a fetal heart rate of 142 BPM and an estimated fetal weight of 460 grams.

37. After the ultrasound was performed, Mrs. Cartagena had to go to the bathroom and was taken by a nurse. While in the bathroom, Plaintiff noticed a lot of blood coming out of her and asked the nurse to call the doctor. The nurse responded that the doctor did not need to see the blood and did not seek further medical help.

38. Mrs. Cartagena was then returned to the same corridor of the ER where she had been waiting for a pelvic exam to be performed since arriving at the hospital.

39. After Dr. Calderon spoke to Mrs. Cartagena at 9:00 am, she was never evaluated again by another doctor for another four (4) hours, past 1:00 pm.

40. While still languishing in the ER´s corridor to get a pelvic exam, Mrs. Cartagena suffered a strong contraction and desperately reached out to another sick patient to ask for help, and the patient proceeded to do so.

41. Aproximately 15 minutes later, that Dr. Calderon came back and asked Plaintiff what was wrong with her since everything in her labs looked normal.

42. The doctor also mentioned to Mrs. Cartagena that she had earlier rejected him to perform the pelvic exam, a statement she vehemently denied. She then told Dr. Calderon that she was in unbearable pain and begged him to perform the pelvic exam and any other medical treatment for her and her baby.

43. Mrs. Catagena was then taken to an unsterile examination room within the ER. The room had an examination chair but no instruments to handle the delivery or the caring of a baby.

44. The ER examination room did not have any fetal monitors, no computers, nor any equipment to monitor the baby's or the mother's vitals.

45. According to the medical record, at about 1:25 pm, a pelvic exam was performed by Dr. Calderon on Mrs. Cartagena. Dr. Calderon described in the record that the patient accepted a pelvic exam and was found with active bleeding with hematoma and membranes bulging.

46. Immediately after Dr. Calderon performed the pelvic exam, he told Mrs. Cartagena that she was not going to have the baby at that moment. Plaintiff told the doctor that she was having the baby now and kept telling him to help her, to look at all the blood. But despite her pleadings, the doctor left the room, and Mrs. Cartagena was left with a nurse.

47. The nurse, having heard what Dr. Calderon, told Plaintiff that she was not having the baby and to quickly get dressed to get her into a wheelchair. Mrs. Cartagena told her that she was unable to get on a wheelchair because she needed immediate help, that she was having the baby at that very moment, and that she could feel something coming out of her that she could touch with her bare hands.

48. The nurse did not believe Plaintiff, did nothing to help her, and kept telling her that she needed to get dressed and that she was not having her baby. She also told Plaintiff that what she was feeling coming out of her vagina was a blood clot, not her baby.

49. While in active labor, Mrs. Cartagena felt a powerful contraction. She pulled herself up, holding into the handles of the examination chair, and while doing so, she felt her baby boy come out of her. She saw her baby fall into the chair and hit his head on one of the handles.

50. The nurse watched in disbelief at what happened and quickly went out to find help.

51. Mrs. Cartagena was left alone in a state of shock, covered in blood, with her baby between her legs and the umbilical cord still attached to him.

52. MGH's medical record shows that Mrs. Cartagena´s baby boy John Bryan Cartagena Hernandez ("John Bryan"), was born alive at 1:30 pm.

53. Approximately 8 minutes after the birth of John Bryan, Dr. Calderon returned to the examination room and tried to assist Mrs. Cartagena with what little was available in that room.

54. Dr. Calderon realized he needed to cut the umbilical cord. Still, he had no scissors or instrument to carry this out at the ER examination room where Plaintiff had delivered her baby.

55. Approximately 20 minutes after the birth of baby boy John Bryan, Dr. Perez and Dr. Rivera, neonatologists, arrived to assist him.

56. Through those 20 minutes, Mrs. Cartagena suffered watching her son being cold, neglected, and left to die without proper medical care.

57. There was nothing in that examination room that could help Mrs. Cartagena or her baby, yet Dr. Calderon failed to transfer them elsewhere in time and simply waited almost 20 minutes before the neonatologists finally arrived.

58. Once the neonatologists arrived and examined Mrs. Cartagena's baby, they asked her if she wanted to hold her son while he died or if she wanted them to try and save him. Plaintiff was left in disbelief by this question since she only wished for somebody to care for her baby John Bryan, which was neglected and left in the cold for almost half an hour. She told both doctors to help her baby and cover him up because he was cold. They proceeded to take him to the neonatal intensive care unit (NICU) while manually giving him oxygen.

59. MGH's medical records show that at 2:05 pm baby boy John Bryan was admitted to NICU after a delivery was performed precipitately and in an uncontrolled, unsterile and totally inadequate environment. At the same time, 2:05 pm, per MGH's record, John Bryan was declared dead.

60. After they took Mrs. Cartagena's son to NICU, Dr. Rivera, obstetrician, arrived at the examination room and promptly requested the nurses to transfer Mrs. Cartagena to a labor or postpartum room as he could not work in the ER since there was nothing in that room to help Mrs. Cartagena. Plaintiff was finally transferred at about 2:40 pm, where Dr. Rivera examined her.

61. The corpse of John Bryan was brought to Mrs. Cartagena at the postpartum area so she and the baby´s father could say their final farewells at about 3:30 pm.

62. At around 7:00 pm, Mrs. Cartagena was moved to a second room, where she remained until the next day, April 11th, 2022, when the hospital discharged her.

63. Dr. Wagner arrived at the hospital on the afternoon of April 11th, 2022.

64. A document called Birth Report, concerning the Demographic Registrars Offices, was filled by MGH´s personnel and delivered to Mrs. Cartagena before she was

discharged. Said document stated that Dr. Calderon handled the delivery of Plaintiff's baby John Bryan, that Abymael Fontanez Hereida tendered him, and that her baby was born head down. All three allegations are false.

65. Dr. Calderon did not deliver baby boy John Bryan. Abymael Fontanez does not appear as a tending physician in the medical record, nor was he ever seen by Mrs. Cartagena. The ultrasound performed on Mrs. Cartagena, two hours before her son was born, revealed a breech presentation.

66. Before discharging Mrs. Cartagena, MGH's personnel tried to have Plaintiff and her mother sign a document stating that Dr. Calderon had assisted Plaintiff during the delivery of her son and had refused a pelvic exam. They both refused to sign the false document.

## FIRST CAUSE OF ACTION FOR NEGLIGENCE UNDER ARTICLE 1536, 1540 & 1541 OF THE PUERTO RICO CIVIL CODE AGAINST MENNONITE GENERAL HOSPITAL AND THEIR PERSONNEL

67. All the allegations contained above are incorporated by reference as if again fully set forth herein.

68. MGH has policies, protocols, procedures and/or requirements for treatment in the departments of emergency, hospital, telemetry, intensive care, radiology, obstetrics, prenatal care, and cardiology in its premises.

69. MGH receives federal funds and must comply with Emergency Medical Treatment and Active Labor Act.

70. MGH ensures that all its personnel, nursing and medical, working within its premises is aware of the EMTALA requirements.

71. While Mrs. Cartagena was in active labor, both Dr. Cartagena and the nurse ceased providing care.

72. MGH provides medical and nursing treatment to all types of patients, like Plaintiff and her baby boy John Bryan, before, during, and after birth.

73. MGH contracted and/or gave privileges to Dr. Calderon, who, with assistance of the medical personnel at MGH, provided medical care to Mrs. Cartagena on April 10th to 11th of 2022.

74. MGH obtains revenue from the services provided to their patients in the departments located within its premises.

75. MGH is responsible for the medical malpractice that occurs in the hospital departments previously mentioned that are located within their premises.

76. MGH contracted, subcontracted, employed, provided privileges or in some way made the arrangements for Dr. Calderon and the obstetricians, pediatricians and neonatologists to timely provide evaluations and adequate medical treatment to Mrs. Cartagena and baby boy John Bryan during the alleged period in this complaint.

77. Dr. Calderon, in addition to the personnel of MGH, failed to assist Mrs. Cartagena adequately in her birthing process.

78. Dr. Calderon and the personnel of MGH failed and incurred in negligence when they filed to perform the necessary diagnostic tests to obtain a sure diagnosis and once they had the convincing medical evidence, they failed by not providing the immediate medical treatment to assist Mrs. Cartagena and her baby boy John Bryan during the birthing process.

79. MGH and Dr. Calderon failed and incurred in negligence when they did not provide Mrs Cartagena with the basic elements necessary for the proper management of a pregnant patient with premature onset of labor.

80. MGH and Dr. Calderon failed and incurred in negligence when they did not provide Mrs Cartagena admission to the labor room in time for her to deliver her son John Bryan.

81. MGH and Dr. Calderon failed and incurred in negligence when they did not provide Mrs Cartagena continuous electronic fetal monitoring to assess fetal heart rate and uterine contractions.

82. MGH and Dr. Calderon failed and incurred in negligence when they did not provide Mrs Cartagena continuous supervision of the labor process by her obstetrician.

83. MGH and Dr. Calderon failed and incurred in negligence when they did not provide Mrs Cartagena immediate assistance of the premature neonate by a neonatology specialist.

84. MGH and Dr. Calderon failed and incurred in negligence when they did not take the neccesarry measures to avoid the unattended, unsterile, and uncontrolled delivery of Mrs. Cartagena's premature baby boy John Bryan, which significantly contributed to his demise.

85. Among other deficiencies, MGH failed and incurred in negligence by not providing adequate nursing care, including monitoring of the mother and child, and alerting obstetrician immediately that the patients were in distress or danger.

86. MGH and Dr. Calderon failed and incurred in negligence by not informing Mrs. Cartagena about the prognosis of her baby in terms of survival as soon as she arrived to the hospital.

87. MGH and Dr. Calderon failed and incurred in negligence by denying Mrs. Cartagena of her moral and ethical right to receive adequate medical information in order to make informed decisions regarding her and her unborn baby's medical care.

88.  The treatment offered by MGH to Mrs. Cartagena and her baby John Bryan through their medical personnel, nurses, technicians and/or physicians that are employed, are interns or have privileges to use their installations, was carried out below the medical standard of care that satisfies the exigencies generally recognized by the medical profession in light of the modern means of communication and teaching and, as such, directly caused and/or contributed to the death of Mrs. Cartagena's baby boy John Bryan.

89. The personnel of MGH did not exercise the care and precautions required under the circumstances to prevent the death of John Bryan, lacked the knowledge and the medical skill required to treat a pregnant patient and her baby, and could not timely have available the personnel and equipment necessary to avoid the suffering and death of her son.

90. The medical and hospital personnel of MGH negligently failed to provide Mrs. Cartagena with competent medical and nursing personnel to evaluate, diagnose, monitor, detect, alert, treat and follow-up in a timely and appropriate way as soon

as Mrs. Cartagena and/or her baby John Bryan showed and expressed great pain and suffering bedore, during, and after the birth.

91. The nursing and medical personnel of MGH did not use available methods to alert, prevent, diagnose, and timely treat Mrs. Cartagena and her son.

92. MGH failed to ensure proper nursing, medical and technical care of Mrs. Cartagena during her labor and delivery by its departments to ensure the safety and health of John Bryan.

93. Mrs. Cartagena and her son required close and continuous medical and nursing supervision, but instead were provided delayed, inadequate or complete lack of treatment during the labor and birth process in MGH.

94. At all pertinent times, the defendant MGH, its directors, officials, and physicians with privileges were negligent when not providing the adequate medical attention to Mrs. Cartagena and her baby boy, due to not providing competent physicians, nor adequate supervision of the defendants, MGH, Dr. Calderon, and other unknown physicians and residents employed by and/or practicing at MGH, and for not exercising due care and the necessary precautions to avoid illicit conduct, causing injuries, and the suffering of the plaintiff.

95. MGH not only failed in selecting, looking out for, interceding, and adequately supervising the defendants, but also failed in securing prompt attention to the patient, instead permitted the use of their installations by physicians with privileges, permitting, encouraging, and condoning negligent care and inadequate treatment to the patients such as Mrs. Cartagena and her baby John Bryan, resulting in the death of her son.

96.  As a result of what has been previously stated, MGH misled those who sought full hospital care into thinking they would be appropriately treated.

97. MGH did not provide the timely services of persons capable of properly and effectively coordinating its departments to provide among others adequate nursing attention and diagnostic studies of Mrs. Cartagena and her baby John Bryan.

98. As a direct and immediate result of the lack of supervision and lack of personnel of MGH in their emergency units, hospital rooms, telemetry and intensive care unit, and the departments of gynecology and obstetrics with the medical personnel and the personnel in charge of coordinating and communicating the necessary information to adequately treat the emergency situations in MGH, Dr. Calderon, and personnel negligently resulted in John Bryan dying.

99. Under Articles 1536, 1540 and 1541 of the Civil Code of Puerto Rico, MGH is responsible for the negligent acts and omissions of their personnel, agents, employees, contractors and subcontractors, as described herein.

100. As a direct and proximate cause the defendant MGH and the fact that its personnel did not adequately treated Mrs. Cartagena and her son, leading to his ultimate death, has caused Mrs. Cartagena to sustain severe pain and suffering and other damages that will affect her for the rest of her life.

## SECOND CAUSE OF ACTION FOR NEGLIGENCE UNDER ARTICLES 1535, 1540 AND 1541 AGAINST DR. JORGE CALDERON AND THE MEDICAL PERSONNEL OF THE MENNONITE GENERAL HOSPITAL

101. All the allegations previously expressed are incorporated by reference as if again fully set forth herein.

102. At the moment of the described incidents in this complaint, Dr. Calderon was the doctor in charge of providing medical care while Mrs. Cartagena was giving birth to her baby John Bryan.

103. The treatment offered by the codefendant Dr. Calderon and the personnel of MGH was below the medical standard that satisfies the expectations generally recognized by the medical profession in light of modern means of communication and teaching and, as a result, directly caused and/or contributed to causing the death of Mrs. Cartagena's son, in addition to the injuries indicated by the plaintiff, as further detailed below.

104. Codefendant Dr. Calderon, and the rest of the personnel of the MGH, negligently failed to provide the competent medical treatment to be able to assist Mrs. Cartagena in the delivery of her baby John Bryan.

105. Codefendant Dr. Calderon and the personnel of MGH did not exercise the care and precautions required under the circumstances to prevent that Mrs. Cartagena's son die.

106. Codefendant Dr. Calderon and the personnel of MGH negligently failed in providing adequate medical care to Mrs. Cartagena and her son, causing his demise.

107. Codefendant Dr. Calderon and the personnel of MGH negligently failed to perform a complete medical history, and a thorough physical examination of Mrs. Cartagena. In spite of this, Dr. Calderon documented in the medical record that he had performed a detailed physical examination on Mrs. Cartagena.

108. Codefendant Dr. Calderon and the personnel of MGH negligently failed to document in the medical record a differential diagnosis of the possible conditions

which should have been considered in a pregnant patient with 22 ½ weeks of gestation complaining from pelvic pain and vaginal bleeding.

109. Codefendant Dr. Calderon´s and MGH´s personnel responsibility, when Mrs. Cartagena was originally evaluated at 9:00 am, was to perform a pelvic exam. However, they did not perform said exam. It was Dr. Calderon's responsibility to go to the patient and explain the need for a pelvic exam at that moment. Dr. Calderon and the personnel of MGH negligently failed to explain the aforesaid to the patient.

110. Codefendant Dr. Calderon and the personnel of MGH negligently failed to deliver Mrs. Cartagena´s baby becasue in spite of finding bulging membranes and a completely dilated cervix after performing a pelvic exam, he left the examination room and Mrs. Cartagena was left with one nurse during labor.

111. Codefendant Dr. Calderón and the personnel of MGH negligently failed to assist Mrs. Cartagena in the delivery of her baby boy John Bryan at the ER hence the procedure was an uncontrolled, and unsterile delivery where a doctor was not present.

112. Codefendant Dr. Calderon and the personnel of MGH negligently failed to care for Mrs. Cartagena and her baby thus her premature baby boy John Bryan remained between Mrs. Cartagena's legs, severely depressed, cold, still attached to the umbilical cord and without oxigen.

113. Codefendant Dr. Calderon and the personnel of MGH negligently failed to perform an adequate history and physical examination of Mrs. Cartagena, failed to truthfully document the facts in the medical record, and failed to promptly notify

Mrs. Cartagena's obstetrician, Dr. Wagner, and the neonatology service of Hospital Menonita Cayey, for them to evaluate Mrs. Cartagena in order to advise her of which medical course to follow.

114. Codefendant Dr. Calderon and the personnel of MGH negligently failed to provide Mrs. Cartagena with the necessary, precise and adequate medical information for the patient to make the right decisions regarding her medical care.

115. As a direct and proximate cause of the codefendants Dr. Calderon and HMC, and/or other unknown individuals, who caused damages, including lack of adequate and timely treatment of Mrs. Cartagena and her baby John Bryan, the plaintiff suffered damages, including emotional, mental, physical, as is described in this complaint.

### THIRD CAUSE OF ACTION
### AGAINST JORGE CALDERON, INC. PURSUANT TO ARTS. 1536 AND 1540

116. The allegations contained above are incorporated by reference as if again fully set forth herein.

117. Codefendant Dr. Calderon was at all times herein pertinent an employee and the principal officer and/or owner of JORGE CALDERON, INC.

118. Codefendant JORGE CALDERON, INC. was at all times herein pertinent the employer of Dr. Calderon while rendering services to MGH.

119. Codefendant JORGE CALDERON, INC. contracted with MGH to provide medical services at the aforesaid hospital.

120. Pursuant to articles 1536 and 1540, JORGE CALDERON, INC. is responsible for the negligence incurred by his employee Dr. Calderon while providing medical treatment to Mrs. Cartagenena at MGH.

## FOURTH CAUSE OF ACTION

## AGAINST SIMED PURSUANT TO 26 P.R. LAWS ANN. § 2001 AND 2003

121. The allegations contained above are incorporated by reference as if again fully set forth herein.

122. Co-Defendant SIMED was at all times herein pertinent an insurance company authorized to do business in the Commonwealth of Puerto Rico and which issued a public liability and/or malpractice insurance policy and/or other applicable insurance on behalf of one or more Defendants and/or other unknown joint tortfeasors.

123. Pursuant to 26 P.R. Laws Ann. § 2001, an insurance company is liable for the negligence or fault of its insured.

124. Pursuant to 26 P.R. Laws Ann. § 2003, an action against an insurer may be brought separately or may be joined together with an action against its insured.

## FIFTH CAUSE OF ACTION
## ACTION AGAINST PRMD PURSUANT TO 26 P.R. LAWS ANN. § 2001 AND 2003

125. The allegations contained above are incorporated herein by reference as if again fully set forth.

126. Defendant PRMD was, at all times herein pertinent, an insurance company authorized to do business as such in the Commonwealth of Puerto Rico which issued a public liability and/or malpractice insurance policy and/or other applicable insurance on behalf of one or more Defendants and/or other unknown joint tortfeasors.

127. Pursuant to 26 P.R. Laws Ann. § 2001, an insurance company is liable for the negligence or fault of its insured.

128. Pursuant to 26 P.R. Laws Ann. § 2003, an action against an insurer may be brought separately or may be joined together with an action against its insured.

## SIXTH CAUSE OF ACTION AGAINST INSURER A, B, C PURSUANT TO 26 P.R. LAWS ANN. § 2001 AND 2003

129. All claims set forth above are incorporated by reference and made a part of the following allegations.

130. From information and belief, at the time of the events described herein, insurers A, B, C, because their names are unknown, insured the named defendants and the unknown defendants.

131. From information and belief these co-defendants issued liability insurance policies and/or insurance policies for negligence due to medical/hospital malpractice in favor of one or more of the co-defendants.

132. Pursuant to 26 L.P.R.A § 2001, an injured party has a direct cause of action against a insurance company, due to the fault or negligence of the insured.

133. Pursuant to 26 L.P.R.A. § 2003, an action against an insurance company, for the fault or negligence of your insured may be brought separately or jointly with the action in against the insured.

134. Therefore co-defendants A, B, C insurance companies are jointly and severally liable for damages caused to the Plaintiffs, and their child, by the co-defendants described above and/or any other named defendant at the time.

## DAMAGES

135. All claims set forth above are incorporated by reference and made a part of the following allegations.

136. As a direct and proximate result of the acts or omissions of all codefendants Mrs. Cartagena has suffered greatly from being mistreated, misdiagnosed, and denied proper nursing care and medical attention before, during, and after labor.

137. As a result of professional negligence, lack of experience, fault, and inexperience of all the codefendants, Mrs. Cartagena physically and emotionally suffered inmensely the devastating loss of her baby boy John Bryan, who she had carried in her womb for six months and who had reached viability, but was never afforded a chance to live.

138. Mrs. Cartagena has suffered greatly from the birth and the death of her baby John Bryan, whom she had to deliver alone and had to watch in horror how he was left unattended in an examination chair, cold, neglected with his umbilical cord still attached, and with no medical assistance.

139. Mrs. Cartagena has suffered greatly from the mistreatment by hospital personnel, who failed to listen to her complaints, failed to believe she was having the baby, failed to treat her son, failed to provide proper medical care and counsel, failed to guide her to make adequate and informed decisions, failed to assist her when she pleaded for medical care but instead was abandoned, humiliated, kept in shock, and confused.

140. Mrs. Cartagena has suffered greatly from the mistreatment of an inexperienced nurse and doctor in caring for a woman in labor, who had to suffer unnecessarily

and gave birth to observe that the hospital personnel was caught by surprise, failing to promptly and adequately respond to the birth of her baby John Bryan, and was thus left in emotional shock.

141. As a direct and proximate result of the codefendants' negligence, Mrs. Cartagena's son was denied adequate medical care and, therefore, was denied the right to fight for his life. Consequently, they stripped him of his right to live.

142. The negligent acts and omissions of the codefendants while providing medical care to Mrs. Cartagena have directly caused her intense physical and emotional pain and suffering, frustration, and a grave sense of injustice valued at no less than FIVE HUNDRED THOUSAND DOLLARS **($500,000)**.

143. The negligent acts and omissions of the codefendants while providing medical care to John Bryan that directly contributed and caused his demised have caused Mrs. Cartagena intense pain and suffering, and a grave sense of injustice valued at no less than FIVE HUNDRED THOUSAND DOLLARS **($500,000)**.

## **TRIAL BY JURY DEMANDED**

144. Plaintiff demands trial by jury on all causes of action herein raised.

WHEREFORE, Plaintiff demands that judgment against the CODEFENDANTS be entered, finding them to be jointly and severally liable to Mrs. Cartagena for an amount of no less than ONE MILLION DOLLARS ($1,000,000.00), as well as costs and attorneys' fees and such other relief as this Honorable Court may esteem to be just and proper under the circumstances.

RESPECTFULLY submitted on this 17th day of March, 2023.

**INDIANO & WILLIAMS, P.S.C.**
Attorneys for Plaintiffs
207 Del Parque St., Third Floor
San Juan, Puerto Rico 00912
Tel: (787) 641-4545
Fax: (787) 641-4544

**s/ Jeffrey M. Williams**
Jeffrey M. Williams
USDCPR Bar No. 202414
jeffrey.williams@indianowilliams.com

**s/ Vanesa Vicéns--Sánchez**
Vanesa Vicéns-Sánchez
USDCPR Bar No. 217807
vanesa.vicens@indianowilliams.com

**s/Luisa M. Vázquez-Cruz**
Luisa M. Vázquez-Cruz
USDC Bar No. 230805
luisa.vazquez@indianowilliams.com